Bernard C. WELCH, a/k/a Bernard C. Welch, Jr., a/k/a Norman Heiman, Appellant,

v.

UNITED STATES, Appellee.

No. 81–840.

District of Columbia Court of Appeals.

Argued March 24, 1983.

Decided Sept. 2, 1983.

Alan B. Soschin, Washington, D.C., appointed by the court, for appellant.

Wendy Bebie, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty. and Michael W. Farrell and John R. Fisher, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

John A. Terry, an Asst. U.S. Atty., Washington, D.C., at the time the briefs were filed, also entered an appearance for appellee.

Before NEWMAN, Chief Judge, and MACK and FERREN, Associate Judges.

MACK, Associate Judge:

On January 14, 1981, appellant was charged in an eleven count indictment with one count each of first-degree felony murder while armed (D.C.Code §§ 22–2401, –3202 (1981)), second-degree burglary while armed (D.C.Code §§ 22–1801(b), –3202 (1981)), and carrying a pistol without a license (D.C.Code § 22–3204 (1981)), and four counts each of second-degree burglary (D.C.Code § 22–1801(b) (1981)) and grand larceny (D.C.Code § 22–2201 (1981)). On April 1, 1981, the trial court heard and denied appellant's motion for change of venue and granted motions to sequester the jury filed by both appellant and by the government. On April 6, the court heard and denied, *inter alia,* appellant's motion to suppress physical evidence seized during a search of his home and automobile. The trial began later on the day of April 6, and on April 10 a jury found appellant guilty of all charges. Appellant was sentenced to a term of imprisonment totalling 143 years to life.

The following issues are raised on appeal:
1. Whether, due to extensive pretrial publicity, appellant was deprived of his right to an impartial jury;
2. whether appellant's right to be present at all stages of his trial was violated by his absence from the voir dire examinations conducted in an anteroom and at the bench;
3. whether appellant was denied his Sixth Amendment right to effective assistance of counsel due to an alleged conflict of interest between trial counsel and appellant; and
4. whether appellant's motion to suppress physical evidence obtained during a search of his home and of his car was erroneously denied.

We affirm appellant's convictions. Because of the nature and scope of appellant's grounds for appeal, we will only briefly describe the events which led to appellant's convictions and include detailed facts relevant to each claim as they are separately discussed.

On December 5, 1980, between 8 and 9:30 p.m., Dr. Michael Halberstam and his wife, Elliott, returned to their residence at 2806 Battery Place, N.W. and were confronted by an intruder who shot Dr. Halberstam and then fled. The Halberstams ran to their car and, while driving to the hospital, noticed a man at an intersection. Dr. Halberstam said "That's the guy," swerved the car toward the individual and struck him. Dr. Halberstam continued driving until he fell unconscious and crashed his car into a tree. He was taken to Sibley Hospital where he was pronounced dead; the cause of death was determined to be gunshot wounds of the chest.

The police were called to Dana Place and University Terrace where Jack Mulford said he had heard gunshots and thought he knew where the perpetrator could be found. Sgt. Robert Cermak was led to 5026 Dana Place where appellant was found and apprehended. Appellant was taken to Sibley Hospital where Mrs. Halberstam identified him as the person who her husband had hit with their automobile. Appellant was then transported to D.C. General Hospital. A search of his personal effects uncovered, among other items, a key which appeared to belong to a Mercedes Benz. On December 6, Detective Russell Drummond received

this key from the Mobile Crime Unit and drove to the 5000 block of Dana Place in an attempt to locate the vehicle to which the key belonged. A Mercedes Benz was found across from 5026 Dana Place (where appellant was apprehended) and the key recovered from appellant opened the door to this vehicle. The car was towed to police headquarters and searched. The murder weapon was found in a tree space near where appellant and the car were discovered; this gun had been reported stolen in a burglary committed a few weeks earlier.

In a voice line-up held on December 12 at Police Department Headquarters, Mrs. Halberstam limited to three the voices which sounded like the one she heard on the night of the burglary and murder; one of the three was that of appellant.

Ms. Mamie Stallworth, who worked at 2816 Battery Place, testified that on December 5, 1980, she observed a silver Mercedes Benz "drifting slowly down to the intersection," make a brief stop at 2806 Battery Place (the Halberstam residence) and then turn the corner. She described the driver as a white male with a moustache, sideburns and brown hair. When Ms. Stallworth left her place of employment to go home at about 5:45 p.m. that evening, she drove down Battery Place to an intersection where she was blocked from getting through by a silver Mercedes. She yelled at the driver to move and he finally maneuvered his car to permit her to pass. At this time, she was eight to ten feet from the driver who she said was the same man she had seen earlier in the day. At a line-up on December 12, Ms. Stallworth identified appellant as the man in the silver Mercedes.

The government presented a series of witnesses who lived in the Halberstam's neighborhood, who testified as to burglaries at their residences on December 5 and who identified items which were recovered during the search of appellant's car as those items missing as a result of the burglaries. In addition, Special Agent John Kelly testified that particles of gunshot residue were found on the blue jeans recovered from appellant.

Appellant put forth a defense of misidentification by presenting four witnesses who testified that they had seen appellant in his home in Great Falls as late as 4:55 p.m. on December 5. On rebuttal, Detective Colen Alford testified that the trip from appellant's home to Dana and Battery Place took 23½ minutes.

I

Appellant first claims that, due to the extensive, adverse pretrial publicity which surrounded this case, the trial court's denial of his motion to change venue denied him due process and, in any event, he was denied his constitutional right to a fair trial by an impartial jury. Specifically, appellant contends that, because a majority of the prospective and deliberating jurors had, through the pretrial media coverage, heard or read about various aspects of appellant's offenses or some other notorious aspect of his life, doubts were raised as to whether the jury could be impartial and unbiased. We are unpersuaded.

It is fundamental that the Sixth Amendment guarantees "to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). When a threat to this constitutional protection is posed, a change of venue is, typically, an appropriate remedy. The Superior Court of the District of Columbia, however, sits as a single unitary judicial district, and change of venue is not available. *United States v. Edwards,* 430 A.2d 1321, 1345 (D.C.1981) (en banc), *cert. denied,* 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 141 (1982). Thus, the court's denial of appellant's motion for a change of venue was required.

Appellant's right to a fair trial by an impartial jury is not defeated, however, merely because the requested remedy is unavailable. Instead, other measures must be

employed to assure that appellant's right to a fair trial is preserved.

Appellant's implicit assertion that the pretrial publicity present in this case was so prejudicial as to warrant the presumption that he was deprived of a fair trial cannot be sustained. The trial court found that:

> [s]ince Defendant's arrest, the local media and at least one magazine of national circulation have published a variety of facts concerning Defendant, including his prior arrests and criminal history. Additionally, the media has published articles relating to the cache of property recovered from the Defendant's home that has probable connections with similar offenses committed both here and elsewhere.

Yet "pretrial publicity, even if pervasive and concentrated, cannot be regarded as leading automatically and in every kind of criminal case to an unfair trial." *Nebraska Press Association v. Stuart,* 427 U.S. 539, 565, 96 S.Ct. 2791, 2805–06, 49 L.Ed.2d 683 (1976).

■ There are circumstances in which the pretrial publicity surrounding a case is so inflammatory that it can be presumed that a defendant was deprived of a fair trial. In *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), a twenty minute "interview" with the defendant, during which he confessed to the charge pending against him, was thrice televised in a town with a population of 150,000 from which the jury panel was drawn. The Supreme Court found that, under those circumstances, a fair trial could not be obtained in the jurisdiction of the offense and reversed the conviction. The publicity surrounding the instant case, however, was not

of such an extreme nature. The trial court specifically found, and we agree, that "the media coverage has been neither inherently prejudicial nor dramatically staged. Rather, the accounts have been straight-forward, unemotional factual accounts of events and of the progress of official and unofficial investigations," and that the publicity was not so inflammatory as to deprive appellant of a fair trial.[1] Thus, here, in the absence of extreme circumstances, the Sixth Amendment inquiry turns on the adequacy of the voir dire. *Khaalis v. United States,* 408 A.2d 313, 334 (D.C.1979), *cert. denied,* 444 U.S. 1092, 100 S.Ct. 1059, 62 L.Ed.2d 781 (1980); *United States v. Chapin,* 169 U.S.App.D.C. 303, 314–15, 515 F.2d 1274, 1285–86, *cert. denied,* 423 U.S. 1015, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975).

■ In analyzing whether the voir dire adequately protected appellant's Sixth Amendment rights, we are guided by several principles. First, it is not required that the jurors chosen to deliberate be totally ignorant of the facts and issues involved in the case.

> In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true of criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impos-

---

1. *Rideau* claims have been rejected in cases in which the pretrial publicity was far more pervasive and accusatory than the publicity in this case. *See, e.g., Khaalis v. United States,* 408 A.2d 313 (D.C.1979), *cert. denied,* 444 U.S. 1092, 100 S.Ct. 1059, 62 L.Ed.2d 781 (1980) (Hanafi takeover); *Jones v. United States,* 386 A.2d 308 (D.C.1978) (first killing of a woman police officer in the United States); *United States v. Sampol,* 204 U.S.App.D.C. 349, 636 F.2d 621 (1980) (Letelier assassination); *United*

*States v. Haldeman,* 181 U.S.App.D.C. 254, 559 F.2d 31 (1976) (en banc), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977) (Watergate); *United States v. Ehrlichman,* 178 U.S.App.D.C. 144, 546 F.2d 910 (1976), *cert. denied,* 429 U.S. 1120, 97 S.Ct. 1155, 51 L.Ed.2d 570 (1977) (Watergate); *United States v. Chapin,* 169 U.S.App.D.C. 303, 515 F.2d 1274, *cert. denied,* 423 U.S. 1015, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975) (Watergate).

sible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin v. Dowd, supra,* 366 U.S. at 722–23, 81 S.Ct. at 1642–43; *accord Murphy v. Florida,* 421 U.S. 794, 799–800, 95 S.Ct. 2031, 2035–36, 44 L.Ed.2d 589 (1975).

 Thus, the test we apply in scrutinizing the effectiveness of the voir dire examinations is not whether a juror had been exposed to the facts and issues of the case nor whether he or she has formed an opinion as to the guilt or innocence of the accused but rather whether the nature and strength of the opinion formed are such as to raise the presumption of partiality. It is sufficient that the juror asserts he or she is able to lay aside his or her impressions and render a verdict based on the evidence presented in court and the court assures itself that this assertion is valid. *Irvin v. Dowd, supra,* 366 U.S. at 723, 81 S.Ct. at 1642–43; *Rease v. United States,* 403 A.2d 322, 326 (D.C.1979) (per curiam). We also note that the "determination of [a potential juror's] impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge," who has broad discretion in judging the extent and impact of pretrial publicity on the jurors and in determining whether a juror should be excused for cause. *Rease v. United States, supra,* 403 A.2d at 325, quoting *Rideau v. Louisiana, supra,* 373 U.S. at 733, 83 S.Ct. at 1422; *Jones v. United States,* 386 A.2d 308, 316 (D.C.1978), *cert. denied,* 444 U.S. 925, 100 S.Ct. 263, 62 L.Ed.2d 181 (1979). Finally, a defendant who claims that he was deprived of a trial before an impartial jury "must sustain that claim 'not as a matter of speculation but as a demonstrable reality,'" *United States v. Haldeman,* 181 U.S.App.D.C. 254, 283, 559 F.2d 31, 60 (1976) (en banc), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977), quoting *Adams v. United States,* 317

U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268 (1942)[2] so as to rebut the "strong presumption . . . that in any case, jurors can be found in the District of Columbia whose exposure to the case will have been sufficiently minimal to enable them to render a fair and impartial verdict." *United States v. Edwards, supra,* 430 A.2d at 1346.

With these guideposts in place, we now look at the manner in which the voir dire preceding appellant's trial was conducted in order to determine whether his right to be tried before a fair and impartial jury was protected.

 The voir dire process extended over a period of two days and constitutes more than three hundred and fifty transcript pages. Each juror was summoned individually into an anteroom and carefully questioned by the court concerning his or her exposure to publicity. Each juror was asked whether he or she had read or heard anything which may have given him or her any knowledge of the facts of the case. When prospective jurors answered affirmatively, the court probed into the precise nature, extent and source of what they had read or heard. Each juror who had been exposed to any pretrial publicity was specifically asked whether he or she had formed any conclusions about the appellant or about the case; whether he or she thought it would be possible to be a fair and impartial juror; and whether, if selected as a juror, he or she would be able to listen to the evidence presented in the courtroom and decide appellant's innocence or guilt based solely on the evidence heard in court and divorce anything that he or she had heard or read outside the courtroom from that determination. Both the prosecutor and defense counsel were given the opportunity to question the jurors and further probe into their exposure to media coverage and the effect of such exposure; some jurors were asked, for example, whether he or she had heard anything else about appel-

**2.** *See also Irvin v. Dowd, supra,* 366 U.S. at 723, 81 S.Ct. at 1642–43; *Rease v. United*

*States, supra,* 403 A.2d at 325–26.

lant's background, about his involvement in other jurisdictions, or about the seizure of property from him.

From an initial panel of 92 prospective jurors, 33 were excused by the court for cause. Of the 12 jurors who ultimately deliberated, eleven had been exposed to some pretrial publicity (although a majority had, at most, routinely followed the events in the media), but none had formed an opinion about appellant's involvement in the offenses and all stated they could decide the case solely on the evidence introduced at trial; one of the twelve had heard nothing of the case.

This thorough and probing inquiry much resembles the voir dire conducted in the "Hanafi trial," *Khaalis v. United States, supra,* 408 A.2d at 335, in which, as here, the pretrial publicity surrounding the events which culminated in the trial, potentially threatened the defendant's ability to be tried before an impartial jury. In *Khaalis,* the court focused on the venire members' exposure to the case, asking whether they had any knowledge of the events involved in the trial; whether they had formed any opinions; whether they could render a fair and impartial verdict; whether they could sit without experiencing extreme difficulty or hardship. The voir dire indicated that a majority of the prospective jurors had followed the news coverage routinely and the court excused several of them for reasons relating to the pretrial publicity. We held there, as we do today, that the voir dire served to protect the right to a fair trial by an impartial jury. *See United States v. Chapin, supra,* 169 U.S.App.D.C. at 316–17, 515 F.2d at 1287–88; *United States v. Haldeman, supra,* 181 U.S.App.D.C. at 288–89, 559 F.2d at 65–66.

 While we find that the voir dire, in itself, adequately protected appellant's rights in this case, several other factors buttress our holding. First, we note that,

as the trial court found, appellant had "sought widespread media coverage, as evidenced by his interview with a magazine of national circulation."[3] He cannot now "complain that the very fact of the publicity [he] wanted interfered with [his] right to a fair trial." *Khaalis v. United States, supra,* 408 A.2d at 334. Next,

> where publicity has not been virulent and sensational, where the community in which the trial is scheduled is large and inundated with other news, where the publicity is nationwide rather than local ... where the jury is thoroughly questioned about what they have read and its effect, and where the jury is then sequestered, some showing of prejudice is required to overturn the trial court's reasoned decision [that the voir dire was sufficient to protect the defendant's rights].

*United States v. Chapin, supra,* 169 U.S. App.D.C. at 318, 515 F.2d at 1289; *see Murphy v. Florida, supra.* The trial court specifically found that precisely this situation existed in the instant case. Appellant's conclusory allegation that the jurors' mere exposure to the publicity denied him an impartial jury is insufficient to sustain the heavy burden which he bears of demonstrating actual prejudice. Moreover, the fact that appellant exercised only eight of the ten peremptory challenges to which he was entitled[4] indicates that no objectionable juror remained on the panel. His failure to invoke this statutory right to its fullest serves to defeat any finding of prejudice. *Shettel v. United States,* 72 U.S. App.D.C. 250, 252, 113 F.2d 34, 36 (1940). Finally, the jury was sequestered during the pendency of the trial and its deliberations, a protective procedure which has been found to enhance "the likelihood of dissipating the impact of pretrial publicity and emphasize[ ] the elements of the jurors' oaths." *Nebraska Press Association v.*

---

3. *Life,* February 1981.

4. Super.Ct.Crim.R. 24(b) provides in pertinent part:

PEREMPTORY CHALLENGES

... If the offense charged is punishable by imprisonment for more than one year, each side is entitled to 10 peremptory challenges.

*Stuart, supra,* 427 U.S. at 564, 96 S.Ct. at 2805.

In sum, we find that appellant has failed to sustain his burden of alleging and proving any specific prejudice he suffered as a result of the pretrial publicity. In any event, the voir dire examinations, along with the sequestering of the jury to minimize the impact of the pretrial publicity, served to provide appellant with an impartial jury which was able to decide the case solely on the evidence presented at trial.

## II

Appellant's second claim is that his constitutional right to be present during all stages of his trial, a right embodied in Super.Ct.Crim.R. 43(a),[5] was violated because he was not present at the voir dire conducted in the anteroom and at the bench when the prospective jurors were questioned on the exposure to pretrial publicity and on their involvement with the criminal justice system respectively. Appellant, relying principally upon this court's decision in *Robinson v. United States,* 448 A.2d 853 (D.C. 1982), emphasizes that since the bulk of the voir dire was conducted in his absence he was denied "an opportunity beyond the minimum requirements of fair selection to express an arbitrary preference" which the peremptory challenge is designed to ensure, *Frazier v. United States,* 335 U.S. 497, 506, 69 S.Ct. 201, 206, 93 L.Ed. 187 (1948), and was thereby unable to assist his counsel in the selection of the jury panel. *Arnold v. United States,* 443 A.2d 1318, 1327 (D.C. 1982). Apparently recognizing that his case differs factually from *Robinson,* he asserts that his failure to object to his absence from these segments of the voir dire in no way affects his right to challenge the process on appeal. We disagree.

 We agree, of course, with appellant that Super.Ct.Crim.R. 43(a), which incorporates the protections afforded by the

Sixth Amendment Confrontation Clause, the Fifth Amendment Due Process Clause, and the common law right of presence, necessitates a defendant's presence during all critical stages of criminal proceedings against him; that such protection includes the right to "be present and to consult with counsel during the jury selection process," *Tatum v. United States,* 330 A.2d 522, 524 (D.C.1974); that the right of the defense to exercise peremptory challenges, which can be used on arbitrary and inexplicable criteria and reaction, may require direct consultation with a defendant and that "something more than second hand descriptions of the prospective jurors' responses to questions during voir dire" can be required, *United States v. Washington,* 227 U.S.App. D.C. 184, ——, 705 F.2d 489, 497 (1983) (per curiam); and that any request by a defendant to permit his or her participation in the voir dire process should be granted. *Robinson v. United States, supra,* 448 A.2d at 855–56; *see also United States v. Alessandrello,* 637 F.2d 131, 138 (3d Cir.1980), *cert. denied,* 451 U.S. 949, 101 S.Ct. 2031, 68 L.Ed.2d 334 (1981).

We part company with appellant, however, when he asserts that under existing law, despite his acquiescence in the conduct of voir dire outside his immediate presence, the right to be present at this stage of the proceedings is of such magnitude that his absence requires reversal. In *Robinson v. United States, supra,* we were dealing with appellant's challenge to the trial court's *refusal to permit* presence at the bench during the bulk of voir dire. We agreed that the court's action in that case constituted a violation of Rule 43, but even under the circumstances there (where counsel argued to the court that his client had asked, and had the right, to be present at the bench) we declined to adopt a rule of reversal per se choosing instead to examine the cases on

---

**5.** Rule 43 reads, in pertinent part:
(a) PRESENCE REQUIRED. The defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule.

an ad hoc basis for the magnitude of the error.[6] *Id.* at 856.

In the instant case, neither appellant nor his counsel requested appellant's participation in, nor voiced an objection to appellant's absence from, those portions of the voir dire which were conducted outside his presence. The narrow issue presented, therefore, is whether appellant, not having raised this issue during trial proceedings can now be heard to complain of his exclusion. We think not.

Our position is buttressed by the language of Rule 43 itself which, in providing for the required presence of the defendant at every stage of the proceedings including, the impaneling of the jury, thereafter notes certain exceptions where continued presence, or presence, is not required. Thus section (b)(1) provides that the defendant shall be considered to have waived his right to be present whenever the defendant, initially present, voluntarily absents himself after the trial has commenced whether or not he has been informed by the court of his obligation to remain during the trial. In light of these provisions, it is reasonable to hold that if voluntary absence from the courtroom even at the most critical stage of proceedings constitutes a waiver for Rule 43 purposes,[7] likewise voluntary acquiescence in voir dire proceedings conducted outside the hearing of the defendant would also constitute waiver.

Our reasoning is further buttressed by the holding of a recent decision of the United States Court of Appeals for the District of Columbia Circuit:

In normal cases, the defendant upon request should be allowed to observe and hear juror responses made at the bench. But because it is a right infrequently exercised and usually delegated to counsel, unless a specific request is made for the defendant to participate at bench examinations of prospective jurors, such right shall be deemed to have been waived.

*United States v. Washington, supra,* 227 U.S.App.D.C. at ——, 705 F.2d at 497.

We hold that appellant's failure either to request that he be present during the portions of the proceedings which took place in his absence or to object to his exclusion therefrom constitutes a waiver of that right and forecloses the opportunity to be heard on appeal.[8]

### III

Appellant next claims that his Sixth Amendment right to effective assistance of counsel was denied because trial counsel had an interest in a trust that appellant created.

We agree, of course, that a criminal defendant has a Sixth Amendment right to be represented by counsel who has

---

**6.** While we noted that we had adopted the "constitutional harmless error" analysis in an analogous situation, we held that the error was not harmless within the meaning of *Frazier v. United States, supra,* and *Arnold v. United States, supra. Robinson v. United States, supra,* 448 A.2d at 856.

**7.** It has been noted that although Rule 43(a) has constitutional underpinnings, its protective scope is "more far-reaching than the rights of presence protected by the Constitution." *Arnold v. United States, supra,* 443 A.2d at 1327 citing *United States v. Alessandrello, supra,* and *United States v. Brown,* 571 F.2d 980 (6th Cir.1978); *United States v. Washington, supra,* 227 U.S.App.D.C. at —— n. 5, 705 F.2d at 497–98 n. 5.

**8.** We commend to the trial court the admonition found in *United States v. Washington:*

When a defendant does request to participate directly, however, the trial judge may, for those jurors whose responses require some degree of confidentiality, conduct that part of voir dire at the bench, in chambers or in some other manner outside the hearing of the other jurors and the public. If other complications arise, such as in cases involving multiple defendants or hardened criminals, they may be handled in other ways, so long as the defendant's right upon request to be present at the bench to observe and hear juror responses is adequately protected. (Footnotes omitted.)

227 U.S.App.D.C. at ——, 705 F.2d at 497; *accord Robinson v. United States, supra,* 448 A.2d at 853.

no conflict of interest. *Wood v. Georgia,* 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981); *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980); *Holloway v. Arkansas,* 435 U.S. 475, 481, 98 S.Ct. 1173, 1177, 55 L.Ed.2d 426 (1978). This right, however, may be waived. *Glasser v. United States,* 315 U.S. 60, 70, 62 S.Ct. 457, 464, 86 L.Ed. 680 (1942). When, as here, the underlying claim is a constitutional right, effective waiver requires that the waiver be an "intentional relinquishment or abandonment of a known right," *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), that is, a "knowing, intelligent act done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 1468, 25 L.Ed.2d 747 (1970). Persons, therefore, may waive constitutional protections as long as the waiver is voluntary, knowing and intelligent. Review of the record in this case discloses that appellant made just such a waiver.

In a hearing on March 25, 1981, the court questioned appellant's counsel regarding the issue of conflict of interest. Counsel was specifically asked whether he was involved in an enterprise or production of any kind for appellant. Counsel responded that he had no involvement whatsoever in such matters and that he referred all contacts from "the media, several publishers, and book writers and enterprising personnel" to another attorney. The subject of conflict of interest was again raised in a hearing on March 30 at which appellant was present. Counsel reiterated his earlier statements, saying

> I have signed no contracts with Mr. Welch, any book writer, any publisher, any author, any movie company, and radio or T.V. station for a book that I or anyone is going to write on this case. I entered into an agreement with no agent, no trustee, or no other third party to receive compensation from any source that may be benefitted as a result of

either radio, T.V., movies, book, of this case.

> \* \* \* \* \* \*

> No agreement [has been] reached with anybody or even a promise to receive any money from any books. So I have absolutely no interest at all, I draw no agreements with anybody.

> \* \* \* \* \* \*

> I have received no money, there is no agreement to pay me any money.

The court then turned its attention toward appellant. Appellant agreed that there was no arrangement with counsel, either through appellant or a third person, concerning fees to be paid counsel for his representation and denied the statements reported in the press that counsel had agreed to represent appellant as a result of having contracted with him to be paid from a book sale, movie or other articles to be sold as a result of the trial. The court then addressed appellant:

> Sir, you understand clearly that in representing you, and if there existed any rights whatsoever in the sale of a book, *it could present a conflict of interest in that the attorney could be, note I said could be, more concerned with the proceeds and sale of the book rather than defending you; you understand that?*

Appellant answered "Yes." A few moments later, after appellant explained that he had not signed any contract and he was not going to do so until after the trial terminated, the court requestioned appellant:

> Well, the court wants you to understand clearly. You do understand there could be a conflict if a contract existed between you and your lawyer concerning fees.

Again, appellant said he understood and added that he wanted his attorney to represent him.

A third hearing was held on April 1 during which the court read into the record a letter received from Fred Grabowsky, Bar Counsel. The letter drew the court's attention to the fact that appellant had signed a

document purporting to grant legal fees to his trial.counsel from profits expected from appellant's sale of publishing rights to his story. At this juncture, appellant explained, for the first time, that with the assistance of another lawyer, he had created a trust fund with his interest going to his children as well as money available to pay for legal fees and to reimburse the court. According to both appellant and his counsel, counsel had no prior knowledge of this trust. The court continued:

> COURT: [Your lawyer] cannot enter into any contractual agreement whereby he is to receive profits from anything, including funds, trust funds, movies, books, or anything; that *there may exist then a conflict of interests whereby his interest in the other things may conflict with his right or his desire to properly represent you. Do you understand that?*
>
> DEFENDANT: Yes.
>
> COURT: All right. Now, understanding that, because you have on your own, without his knowledge, entered into an agreement whereby he may receive some funds that would compensate him for having represented you, do you waive any action you would have in connection with any claim of ineffective representation as a result of a conflict?
>
> DEFENDANT: Yes.
>
> COURT: You waive that?
>
> DEFENDANT: Yes, I waive it.
>
> COURT: Do you understand what you are doing?
>
> DEFENDANT: Yes, I do. *That means I would never use it on appeal.*

> COURT: You could never use, on appeal, saying that he did not represent you effectively.
>
> DEFENDANT: Right.

■■■ Applying the facts presented to the standard for measuring effective waiver, we find appellant voluntarily, knowingly and intelligently waived his constitutional right to be represented by counsel who was free from conflict of interests. Appellant, a 40-year-old with a high school education, had been found competent to stand trial. The interviewing psychiatrist testified that appellant was lucid, his thinking clear and well organized and that he was able to understand everything which was discussed during the mental status examination. On three separate occasions, twice on March 30 and again on April 1, the court advised appellant of the possibility of and consequences which could flow from a conflict of interests by his attorney; all three times, appellant unequivocally stated that he understood the risks.[9] After appellant waived his claim of ineffective assistance based on conflict of interest, and the court asked if he understood what he was doing, appellant volunteered, "That means I would never use it on appeal." We conclude that the trial court was diligent and thorough in carrying out its duty to make an affirmative, on-the-record determination that appellant was aware of the possible dangers and elected to assume the risks involved. *See Robertson v. United States,* 252 A.2d 518, 520 (D.C.1969); *Lord v. District of Columbia,* 235 A.2d 322, 323 (D.C.1967). Appellant's waiver was effective and he cannot now, in his own words, "use [the claim of ineffective assistance] on appeal."[10]

---

**9.** One court has held, in a case involving multiple representation, that "the court's inquiry [regarding waiver of counsel free from conflict of interest] ... should take place after the defendants have had a reasonable time to digest and contemplate the risks posed by joint representation." *United States v. Curcio,* 680 F.2d 881, 889 (2d Cir.1982). Similarly, in this case we note that on March 30 appellant was twice advised of the risks inherent in a situation where counsel had any right in the sale of a book etc., and twice stated he understood the nature of such a conflict. It was not until April

1, after once again being warned of the potential pitfalls, that appellant waived his rights.

**10.** Appellant also asserts that his Sixth Amendment right to effective assistance of counsel was violated because the court (1) did not determine, until after the trial, whether appellant was indigent and entitled to have counsel appointed under the Criminal Justice Act (CJA), and (2) failed to conduct a hearing on appellant's request for additional counsel.

The thrust of appellant's first claim is that, because his attorney was not appointed under

## IV

Appellant next asserts that the trial court erred in denying his motion to suppress physical evidence because the evidence was obtained pursuant to an illegal search. Specifically, he maintains that any consent to search his vehicle and home given by Linda Hamilton was not voluntary and, in any event, Hamilton's authority to consent did not extend to include the areas from which the property was seized. We disagree.

On December 6, 1980, Detective Wood, as part of the investigation of appellant's involvement in the shooting of Dr. Halberstam and the burglary of the Halberstam home, attempted to locate the owner of the automobile which the police discovered on Dana Place and believed to have been used in the offenses. By tracing the license plate number, Wood learned that the car was registered to Linda Hamilton in Great Falls, Virginia. At the request of Wood, Detective Neese went to Hamilton's home. Hamilton verified that she was the owner of the vehicle and explained that her husband had been driving it last but had not returned home. Hamilton was informed that a gentleman had been involved in a traffic accident the previous evening but was not seriously injured; she was asked to come to Wood's office to talk to him in reference to the accident.

Hamilton called her friend, Lawrence P. Tutas, asked him to accompany her to the

CJA until after the trial, he was denied access to funds for investigatory purposes and expert assistance and thereby denied effective assistance in the preparation of his case. The record belies such contentions. Appellant was authorized by the court to retain the services of three mental health experts to assist him with his potential insanity defense; he secured the services of a private investigator and artist; he obtained two court-issued subpoenas for witnesses and called five witnesses on his behalf. Appellant has failed to allege any prejudice from which he suffered due to the timing of counsel's appointment under CJA; we can detect none. We also note that, pursuant to then Superior Court Judge Belson's order of December 24, 1980, appellant was required to provide a signed affidavit regarding his assets before the court would approve a CJA appointment. This affidavit was not tendered until late on April 1, the first day of trial.

Appellant's second claim is, likewise, unsubstantiated. Appellant alleges that the court was required to conduct a hearing in response to his statement, "I was wondering in a case like this would I be entitled to two attorneys." Section IV of the "Plan for Furnishing Representation to Indigents under the District of Columbia Criminal Justice Act" provides that "[i]n an extremely difficult case, where the court finds that it is in the interest of justice to appoint two attorneys to represent one defendant ... two attorneys may be appointed." The court, in construing the phrase "extremely difficult," must make inquiry sufficient to collect a body of information from which it can make an informed decision as to the nature and complexity of the case.

If the basis of the request for co-counsel stems from a claim that an additional attorney is necessary to meet the burdens of an "extremely difficult" case, the trial court must make an inquiry sufficient to satisfy it that the case is "extremely difficult." If there is any suggestion that the request for co-counsel is necessary to safeguard the right to effective representation by counsel, a more extensive inquiry is required; the trial court is under a constitutional duty to make an on-the-record inquiry sufficient to determine the nature and scope of this Sixth Amendment pretrial claim. *Pierce v. United States,* 402 A.2d 1237, 1243–44 (D.C.1979); *see also Lewis v. United States,* 430 A.2d 528, 529–30 (D.C.) (per curiam), *cert. denied,* 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981); *Monroe v. United States,* 389 A.2d 811, 820–21 (D.C.), *cert. denied,* 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978).

Appellant's reference to the possibility of his having more than one attorney came on the heels of his statement to the court "I still want [my attorney] to represent me. I feel he is working for my case." While this comment was made in the context of a discussion on conflict of interest, it manifests his satisfaction with his attorney. Both the wording and the timing of appellant's casual inquiry indicate that he was not seeking additional counsel based on a claim of ineffective assistance.

The court, then, was only required to gain sufficient information from which it could make an informed decision as to whether the case was "extremely difficult" thereby warranting appointment of additional counsel. In light of the fact that the court had held several status hearings and was familiar with the case (the trial was scheduled to begin the following day), we conclude there was no need to conduct further inquiry in order to determine whether the case met the standard for being "extremely difficult" and therefore the court's denial of appellant's request was proper.

Metropolitan Police Department and the two of them drove to meet Wood. All three of them went to D.C. General Hospital where Hamilton identified appellant as her husband, and they then returned to Wood's office. At this time, Wood explained that the car had been involved in a crime and that he wanted Hamilton to give her consent to search the vehicle. Wood explained that she had the right to refuse consent but that if she did refuse, he would attempt to obtain a search warrant. Hamilton was given and read a blank "consent to search" form. Wood then completed the form with data regarding her car and returned the form to her. After re-reading it, Hamilton signed the paper.

While taking a statement from Hamilton that afternoon, Wood learned that there were a smelter for melting gold and silver, tax records relating to shipments of gold and silver ingots to refiners and purchasers, and boxes of materials not yet melted down, located at her residence which she shared with appellant. Wood asked if Hamilton would consent to a search of her home and she agreed. Prior to obtaining the consent, Wood advised Hamilton of her right to refuse to consent, did not make any threats or promises with respect to the consent, and advised her that if she did not consent, attempts would be made to secure a search warrant.

Police searched the Great Falls residence on December 6. Ammunition holders, handcuffs, a handcuff holder, a .357 magnum and an FBI badge were found in a desk in the basement office; various items of jewelry were recovered from boxes in the office.[11]

The automobile, also, was searched on December 6 in the basement garage of police headquarters. According to Carl L. McClannahan, a technician with the Crime Scene Examination Section of the Metropolitan Police Department, "inside the trunk, there were several baby carriage type items, and also a green nylon-like drawstring bag, and a white or cream and red or maroon tote bag." The indictment linked at least 59 items recovered from the green bag to various burglaries.

From a second green bag, found inside the cream and maroon tote bag, 51 items were recovered which were subsequently linked to burglaries for which appellant was charged. An additional 59 items were seized from inside the maroon tote bag other than those contained in the green bag.

Each of these 169 items admitted into evidence was identified by various burglary victims[12] as having been stolen in burglaries of their homes on December 5, 1980.

We agree with appellant insofar as he states that if the searches of the home and the vehicle were illegal, that the items recovered during the searches should have been suppressed. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Our first task, therefore, is to ascertain the legality of the searches.

It is well-settled that a search conducted without a warrant issued upon probable cause is per se unreasonable and, absent an exception, violates the Fourth Amendment. One of the specifically established exceptions to both the warrant and probable cause requirements is a search conducted pursuant to consent. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973); *Jackson v. United States,* 404 A.2d 911, 920 (D.C.1979). In order to justify a search on the basis of consent, the consent must be voluntary, such voluntariness to be determined by the totality of the surrounding circumstances including the characteristics of the consenting individual and the details of the interrogation which gave rise to the consent. *Schneckloth v. Bustamonte, supra,* 412 U.S. at 229, 93 S.Ct. at 2048. Relevant factors in making this determination in-

---

11. Witness Chaney identified these items as having been taken in the November burglary of his home.

12. Complaints in counts 4 through 11 of the indictment.

clude the age of the person, his or her education, mental and physical condition, whether he or she was under arrest, the length and nature of the interrogation and whether he or she was told of the right to refuse to consent. Consent "must be proved by clear and positive testimony, and it must be established that there was no duress or coercion, actual or implied. The government must show a consent that is 'unequivocal and specific.'" *Judd v. United States,* 89 U.S.App.D.C. 64, 66, 190 F.2d 649, 651 (1951) (citations omitted). Finally, permission for the search need not be obtained from the defendant; it is sufficient if the consent to search was obtained from a third party "who possessed a common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974); *Jackson v. United States, supra,* 404 A.2d at 920.

In applying these principles to the case before us, we note that Hamilton was a 32-year-old woman with a high school education. She was not in custody and had been advised of her right to refuse to consent to a search of her home and of her car. Hamilton's friend, Larry Tutas, who accompanied her to the police station, was present when Hamilton spoke with Detective Wood, thereby lessening any possible danger of coercion. Although Tutas testified that Hamilton was "emotionally upset" and shaken up when she was at police headquarters, he also said she was not out of control, nor "beyond knowing what she was doing." When she "lost her composure a couple of times," Detective Wood gave "her time to get herself together" before proceeding. There is absolutely no indication, nor allegation, that Hamilton was threatened or coerced into giving her consent to the search. In fact, after orally agreeing to the search, Hamilton affirmed her consent in writing.

 The trial court, in denying appellant's motion to suppress, specifically found that, as the lawful owner of the vehicle, Hamilton had authority to consent and found "no evidence of duress, coercion, or deceit that would vitiate the voluntariness" of that consent. The court further found that Hamilton, the lawful owner of the home, intelligently and voluntarily gave her consent to search her residence. Since determinations on the issue of consent are factual in nature, *Crisafi v. United States,* 383 A.2d 1, 6 (D.C.), *cert. denied,* 439 U.S. 931, 99 S.Ct. 322, 58 L.Ed.2d 326 (1978); *Terrell v. United States,* 361 A.2d 207, 210 (D.C.), *cert. denied,* 429 U.S. 984, 97 S.Ct. 501, 50 L.Ed.2d 594 (1976), they may not be reversed unless they are clearly erroneous. *See* D.C.Code § 17–305(a) (1981). The evidence of the circumstances surrounding the consent fully supports the findings of the trial court. We therefore affirm its finding that Hamilton's consent was given voluntarily.

Appellant, alternatively, asserts that, even if Hamilton's consent was voluntary, Hamilton did not have authority over, mutual use of, or general access to the basement "office" and desk in her home or to his bags in the trunk of the automobile to clothe her with the right to consent to the searches. In short, appellant asserts Hamilton did not possess the "common authority" over these effects to give a valid third-party consent under *United States v. Matlock.*

 The Supreme Court has defined the scope of "common authority" that is the prerequisite for third-party consent:

[It] rests . . . on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his [or her] own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*United States v. Matlock, supra,* 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7. The trial court ruled that under this standard, Hamilton had sufficient authority over both the home and the vehicle to authorize the challenged searches. Since this determination

is likewise factual in nature (based as it is on concepts of mutual use and joint access), we may not reverse this finding on appeal unless it is clearly erroneous. *Crisafi v. United States, supra,* 383 A.2d at 6; *Terrell v. United States, supra,* 361 A.2d at 210; *see* D.C.Code § 17–305(a) (1981). We conclude the trial court's ruling on this issue is correct and therefore affirm.

Unquestionably, Hamilton, as legal owner and joint occupant of the Great Falls home, had authority to consent to a search of it, *United States v. Matlock, supra,* 415 U.S. at 171, 94 S.Ct. at 993; *Villine v. United States,* 297 A.2d 785, 786–87 (D.C.1972); we need focus only on whether she had sufficient access to and contacts with the basement office to clothe her with the authority to consent to a search of that room. The evidence presented showed that Hamilton stored some of her personal property in the basement and occasionally did some typing there. Although she did not have a personal key to the office, the key to the room was kept in the kitchen cupboard to which she did have free access.[13] These facts are similar to those in *United States v. Harrison,* 220 U.S.App.D.C. 124, 679 F.2d 942 (1982) in which the defendant's wife consented to a search of the unlocked and open storage area in the basement of her home which contained personal items of both the defendant and his wife; the searched boxes, located in the storage area, were not sealed. The court found that the wife had full "common authority" over the storage area under the *Matlock* criteria and therefore had authority to consent to a search of that area. *Id.* at 129, 679 F.2d at 947; *see also White v. United States,* 444 F.2d 724, 726 (10th Cir.1971) (defendant's common law wife, who jointly occupied his hotel room, had authority to consent to search of zipper bag in the room; "a wife may give consent to search premises that she has a right to use and occupy equal to that of her husband"); *cf. United States v. Heisman,* 503 F.2d 1284, 1288 (8th Cir.1974) (co-lessor's

consent to search other lessor's room not valid because room set aside for lessor's own private use); *Reeves v. Warden,* 346 F.2d 915, 924–25 (4th Cir.1965) (mother, a guest/tenant in a home, lacked authority to consent to search of son's room which was set aside exclusively for his regular use).

Hamilton was the owner of the home and had access to the office and to the key for the office. She had sufficient relationship to the basement and to the unlocked desk located therein to authorize a search of those items.

The validity of the consent to search the automobile and its trunk cannot be seriously questioned. Hamilton was the registered owner of the car. When appellant used this car, he assumed the risk that Hamilton would consent to a search of it. *See Frazier v. Cupp,* 394 U.S. 731, 740, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969) (no reasonable expectation of privacy in jointly controlled property; one assumes the risk that the other may consent to a search of the property); *Villine v. United States, supra,* 297 A.2d at 787. Further, there was no indication that appellant intended to assert an exclusive right of control over the unlocked bags in the trunk nor that these items were his private property. *Compare United States v. Harrison, supra,* 220 U.S.App.D.C. at 129, 679 F.2d at 947 (wife had authority to consent to search of unsealed boxes; defendant never asserted boxes were exclusively in his control or that they were his personal effects) *and Johnson v. United States,* 349 A.2d 458 (D.C.1975) (tenant had authority to consent to search area which was "neither ... exclusively used by or specifically set aside for use of [defendant]") *with United States v. Block,* 590 F.2d 535 (4th Cir.1978) (guest retained expectation of privacy in his *locked* footlocker even though homeowner could consent to a search of the open areas of the guest's room) *and United States v. Isom,* 588 F.2d 858, 861 (2d Cir.1978) ("the consent of the

---

**13.** *Cf. Villine v. United States, supra,* 297 A.2d at 787 n. 4 (fact that co-tenant who gave consent to search apartment did not have a key is

only one factor to consider when determining if co-tenant had equal right to possession of the apartment).

host should ordinarily be insufficient to justify a warrantless search when it is obvious that the item is the exclusive property of the guest") *and United States v. Blok*, 88 U.S.App.D.C. 326, 328, 188 F.2d 1019, 1021 (1951) (supervisor's consent to search desk, which appellee had exclusive right to use, was not valid). Thus, the trial court's finding that Hamilton had a sufficient relationship to the automobile and to the items in its trunk to authorize a complete search is fully supported by the record.[14]

It is therefore ordered that the convictions appealed from be and are hereby

*Affirmed.*

---

**14.** Moreover, apart from the question of valid consent to search the automobile and the Great Falls residence, we note that the trial court's ruling that probable cause existed to support a warrantless search of appellant's vehicle was correct. *See United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *Jackson v. United States, supra*, 404 A.2d at 920; *Shreeves v. United States*, 395 A.2d 774, 785–86 (D.C.1978), *cert. denied*, 441 U.S. 943, 99 S.Ct. 2161, 60 L.Ed.2d 1045 (1979); *see generally Chambers v. Maroney*, 399 U.S. 42, 49–50, 90 S.Ct. 1975, 1980, 26 L.Ed.2d 419 (1970). The record also confirms the court's ruling that probable cause existed to support a warrant to search appellant's home. *See Illinois v. Gates*, —— U.S. ——, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983); *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965).