### UNITED STATES of America

v.

### Benjamin F. HARRISON, Appellant.
### (Two cases)

### Nos. 80–2431, 81–2175.

United States Court of Appeals, District of Columbia Circuit.

Argued March 11, 1982.

Decided June 1, 1982.

---

William J. Garber, Washington, D. C., for appellant.

Frederick D. Baron, Asst. U. S. Atty., Washington, D. C., with whom Stanley S. Harris, U. S. Atty., John A. Terry, Michael W. Farrell and James F. Rutherford, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before MacKINNON and MIKVA, Circuit Judges, and WILSON COWEN,* Senior Judge, United States Court of Claims.

Opinion for the Court filed by Circuit Judge MacKINNON.

MacKINNON, Circuit Judge:

Appellant Benjamin F. Harrison was indicted for possession of a controlled substance with intent to distribute (21 U.S.C. § 841(a)), and for possession of a narcotic drug (33 D.C.Code § 402). A jury found him guilty on the first count. The D.C. charge was subsequently dismissed. Harrison's appeal contends that certain of the evidence admitted against him should have been suppressed and that he was improperly denied a new trial on "new evidence" discovered a year after his conviction. We find no merit in either of these claims and affirm the conviction.

## I

At 11:00 p. m. one Friday night in November, 1979, appellant's wife, Carolyn Harrison, was ordered at gunpoint to admit two men into the home she shared with appellant at 1407 Rittenhouse St., N.W., Washington, D.C. The gunmen, who claimed to be looking for money and drugs, tied Mrs. Harrison to a chair and then ransacked the house. Mrs. Harrison remained tied up until approximately 6:00 a. m., when she managed to telephone her brother, who came to the house and cut her loose. (Tr. II 26–28, 43, 52–54, 69). Mrs. Harrison did not see the burglars again, but a few days after the burglary she received a package (which appellant subsequently opened) returning the amount of money taken by them from the house. (Tr. II 55–57, 61–62).

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

For over a year prior to the burglary, Mrs. Harrison had on numerous occasions noticed her husband bringing marijuana into their house. (Tr. A 6–7). During that period, she had frequently seen him weighing marijuana on his scales, making telephone calls about the sale of marijuana, distributing marijuana in the basement to people who came to the house, and counting large amounts of money. At appellant's request, she had even helped him on one occasion package some marijuana, and in another instance had counted more than $2,000 for him. (Tr. I 32–35, 86).

Several weeks after the November burglary, out of concern for her own safety and dismay over her husband's continued drug dealings, she phoned the District of Columbia Metropolitan Police Department to seek advice. She was referred to Detective Allen R. Penberg, who set out a number of possible courses of action she might pursue. (Tr. A 5–6, 39). For the moment, she decided to do nothing in the hopes things would improve.

Over the next few months, Mrs. Harrison did nothing more vis-a-vis her husband's marijuana activities than to call Detective Penberg periodically (there were four or five calls altogether), to keep him apprised of her husband's continued drug sales. On May 28, 1980, however, in a storage area used by both her and appellant under the basement stairwell, she found two large unsealed boxes containing seventeen packages of marijuana. The boxes had not been there the previous evening. (Tr. A 10, 12, 28).

The next evening, at about 8:00 p. m., she phoned Detective Penberg and asked him to come to her house to remove the marijuana. (Tr. A 12, 19, 36–38). At approximately 8:30 p. m., Detective Penberg, accompanied by Detective Dwight A. Rawls, arrived at the Harrison residence. Mrs. Harrison invited the detectives into the house and expressed her desire that they remove the marijuana from the house as soon as possible. She also told them that appellant had warned her not to call the police in the past. She felt some urgency about removing the marijuana because she was unsure when appellant might return to remove it. (Tr. A 13, 19–20, 47, 53–56).

Following a discussion with the detectives as to how she might protect herself from appellant once the marijuana had been removed, Mrs. Harrison led the detectives to the basement and showed them two cardboard boxes containing marijuana. (Tr. A 20, 47). She knew that she was not required to show them the boxes and could have insisted on a search warrant. (Tr. A 20–21). At Mrs. Harrison's request, the detectives removed the boxes, together with some scales, additional small packages of marijuana, strainers, plastic bags, cigarette papers, sifters, measuring cups, and a ledger sheet containing entries of numbers alongside various names found in some nearby boxes also in the basement. (Tr. A 49–50; Tr. II 44–47, 64).

Mrs. Harrison accompanied the detectives to police headquarters where they prepared a fictitious search warrant that she could show to appellant "for protection." No affidavit was prepared in connection with the fictitious warrant. (Tr. A 21–22, 51). The detectives told Mrs. Harrison that the warrant was invalid. (Tr. A 23). Mrs. Harrison was also given a fictitious citation release form instructing her to appear in court, so that it would appear to appellant that she had been arrested even though she had not. (Tr. A 50).

At headquarters, the detectives took the packages of marijuana from the boxes to examine and weigh them. (Tr. A 24). Detective Penberg, who was accepted as an expert on narcotics, stated that all the paraphernalia seized from appellant's basement could be used in packaging marijuana for distribution. He estimated the "street value" of the marijuana seized as between $7,000 and approximately $13,000, depending upon the units in which it would have been sold. (Tr. II 172–174, 183–184).

## II

Following his indictment for violating 21 U.S.C. § 841(a) and 33 D.C.Code § 402, appellant moved to have all the evidence

seized in the Harrison basement suppressed on the grounds that Detectives Penberg and Rawls did not have a search warrant to enter his house and that Mrs. Harrison did not have the authority to release the boxes of marijuana into police custody. The motion was denied and the case proceeded to trial. A jury found appellant guilty of possession of a controlled substance with intent to distribute. The lesser D.C. charge was subsequently dropped.

Appellant then made a timely motion for a judgment of acquittal notwithstanding the verdict, or, in the alternative, for a new trial. The motion for new trial claimed support from evidence brought to appellant's attention shortly after trial. It involved two potential witnesses, Thomas Whitney and Linville Miller, who had been subpoenaed by the prosecution on the advice of Mrs. Harrison as *possible* witnesses to the fact that appellant ran a drug sales operation in the basement of the Harrison home. However, when Whitney and Miller were interviewed by the prosecutor they denied ever purchasing marijuana from appellant, seeing anyone make such a purchase from appellant, or knowing anyone who had done so. The prosecution then excused them as witnesses. Appellant's counsel was not informed of their interrogation.

The court denied without a hearing appellant's motion for j. n. o. v. and for a new trial and sentenced appellant to eighteen months' imprisonment with a two year special parole term. Execution of all but two months of the sentence was suspended in favor of probation for three years with the condition that appellant pay a $5,000 fine.

On July 7, 1981, appellant gained access to documents from the Department of the Treasury that set out interviews conducted by a Secret Service agent with Mrs. Harrison and Detective Penberg about appellant's possible drug dealings with Treasury employees during appellant's employment with the Secret Service from November 4, 1974, to March 27, 1976. The report had not been provided to appellant before trial. Claiming that the report was integral to his case because it disclosed alleged discrepancies in Mrs. Harrison's testimony, appellant moved on September 21, 1981, for a new trial. The motion was denied without a hearing on October 19. This consolidated appeal from the denial of the initial motion for j. n. o. v. or for new trial and the October 19, 1981 new trial motion followed.

III

Appellant contests his conviction on a number of grounds. He argues: (1) that his Fourth Amendment rights were violated by the alleged unauthorized search of his basement and the seizure of the marijuana; (2) that the introduction of evidence that burglars had ransacked his house looking for drugs was plain error insofar as it was hearsay, and was irrelevant to the case; (3) that the testimony concerning his past drug dealing was inadmissible as being prejudicial and similarly irrelevant; (4) that he was deprived of due process by the fact that the prosecution did not disclose to appellant's counsel the interviews with Whitney and Miller; (5) that he was entitled to a new trial once the evidence regarding the Secret Service interviews had come to his attention because that evidence could have been used to his advantage; (6) that Mrs. Harrison's testimony regarding her calls to Detective Penberg was inadmissible because it was given in response to questions by the prosecution calling for hearsay answers; and (7) that the "ledger" sheet was inadmissible and irrelevant because it set out past poker winnings, not money secured through drug dealings as alleged. We find all of these arguments to be without merit.

A. Seizure of the Evidence

▮ It is "well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). *See also Coolidge v. New Hempshire*, 403 U.S. 443, 487–90, 91 S.Ct. 2022, 2048–50, 29 L.Ed.2d 564 (1971) and *Davis v. United States*, 328 U.S. 582,

593–94, 66 S.Ct. 1256, 1261, 1262, 90 L.Ed. 1453 (1945). This exception to the warrant requirement is not limited to consent *by a defendant* as noted in *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974):

> [W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed a common authority over or other sufficient relationship to the premises or effects sought to be inspected.

"Common authority" is defined as resting— on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the coinhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched. *Id.* at 171 n.7, 94 S.Ct. at 993 n.7.

Consent by third parties with common authority over the premises searched "is valid against the absent, nonconsenting person with whom that authority is shared." 415 U.S. at 170, 94 S.Ct. at 992. In *Matlock* the Court explicitly included within the scope of this general rule the notion that "a wife's permission to search the residence in which she lived with her husband could 'waive his constitutional rights.'" *Id.*[1] *See also United States v. Hendrix*, 595 F.2d 883 (D.C.Cir.1979), *United States v. Sumlin*, 567 F.2d 684, 687–88 (6th Cir. 1977).

In the instant case, Mrs. Harrison had full "common authority" to the storage area in the basement. That area was unlocked and open, and contained personal items that belonged to both appellant and his wife. (Tr. I 11, 27). The boxes were not sealed or taped and were closed only by "criss-crossed" flaps. (Tr. I 23, 30, 47, 49). More-over, the record provides no indication that the boxes were marked in any way indicating appellant's ownership. Nor is there anything in the record to indicate that appellant ever asserted that the boxes were exclusively in his control or even that they were his personal effects. He did not testify at the suppression hearing; and at the trial he denied that he had brought the boxes into the house and gave no other indication of interest in the boxes.

Under the circumstances, we find that Mrs. Harrison had full authority to release the boxes of marijuana into police custody, viz., she fits fully within the "common authority" criteria enunciated in *Matlock*. Appellant's argument that his Fourth Amendment rights were violated must accordingly be dismissed.

### B. The Burglary

Mrs. Harrison testified concerning the November, 1979 burglary:

> I let the person in from the back door. He had a ski mask on his face and he came in and they asked if there were any drugs or money in the house, and I told them, "No." (Tr. II 27; emphasis added).

Appellant contends that this testimony is irrelevant and inadmissible as hearsay. We find the portion of the testimony to which objection was made to be harmless. The remoteness, in point of time of the November, 1979 statement to the May 29, 1980 offense charged in the indictment, greatly minimizes the weight of the statement. Also, the burglars did not find any drugs, and that fact helped the defense. Finally, we can say with fair assurance, after considering the entire record, that the judgment of conviction was not substantially swayed by the testimony of such incident to which objection was made. *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). There is so much substantial evidence to support the offense, committed on or about May 29,

---

1. In *Matlock*, the daughter of the lessees of a house consented to a warrantless search of a house, including a bedroom she shared with the defendant. The Court upheld the search of the bedroom closet in which the police found evidence that incriminated the defendant in a bank robbery. 415 U.S. at 169–172, 94 S.Ct. at 992–993.

1980, some six months after the burglary, that the comparative weight of the testimony to which objection was made was very minimal.

### C. Testimony About Past Drug Dealing

■ Appellant's challenge to the admission of testimony concerning his past drug dealing in the Harrison basement is similarly without merit. Rule 404(b) of the Fed.R. Evid. provides:

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Mrs. Harrison's testimony about past drug dealings, that she had personally observed, established a course of dealing by appellant, of which the May 29, 1980 possession charged was only the latest episode. Her testimony constituted "proof of motive, intent, preparation, plan, knowledge, identity [and] absence of mistake." As such, said testimony was admissible under Rule 404(b).

Appellant argues that the testimony was unduly prejudicial, in that it unfairly instilled in the minds of the jurors the idea that appellant was a criminal who was liable to do something like the crime alleged. We see nothing "unfair" in having his actions so construed. Appellant's argument is without basis. Such testimony can only be excluded "if its prejudicial impact unfairly outweighs its probative value." *United States v. Day*, 591 F.2d 861, 878 (D.C.Cir. 1978) (emphasis in original).

In determining whether 'the probative value is *substantially* outweighed by the danger of *unfair* prejudice' it is a sound rule that the balance should generally be struck in favor of admission when the evidence indicates a close relationship to the offense charged. *Id.* (emphasis in original).

Here, the testimony undeniably concerned "evidence ... close[ly] rela[ted] to the offense charged," and there is nothing "unfair" in admitting direct evidence of the defendant's past acts by an eyewitness thereto that constituted substantive proof of the relevant intent alleged in the indictment. The intent with which a person commits an act on a given occasion can many times be best proven by testimony or evidence of his acts over a period of time prior thereto, particularly when the activity involves a continuous course of dealing.

### D. The Interviews with Whitney and Miller

■ Appellant contends that the prosecution had a duty to disclose the interviews with Whitney and Miller to appellant's counsel prior to or during trial, and that the failure to do so constituted a violation of the Due Process clause of the Fifth Amendment. We reject these contentions. That these potential witnesses in an exploratory interview stated that they had *not* purchased drugs from Harrison, or observed him selling drugs, was basically irrelevant. Mrs. Harrison never stated or testified that she had seen Whitney or Miller ever purchase marijuana from her husband. She only suggested that they were *possible* buyers whom the prosecution might want to interview. Their denial of any participation in any drug deal involving appellant in no way contradicted Mrs. Harrison's testimony. It follows, then, that Mrs. Harrison did not perjure herself on this point, that their testimony would not contradict her prior statement, and that the prosecution accordingly need not have turned information on the interviews over to defense counsel for any such reason. Appellant made no request prior to or during trial that the prosecution turn over any such evidence to appellant's counsel. Under such circumstances, as will be discussed below, the prosecution had no duty to report to appellant's counsel that the interviews in question had taken place.

In *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1975), the Supreme Court set forth the standards for

disposing of alleged due process violations due to prosecutorial nondisclosure of exculpatory evidence in situations in which a specific request for such disclosure is *not* made by the defendant. First, if the prosecution knew or should have known that the undisclosed evidence would have demonstrated perjury by one of its witnesses, the conviction must be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." 427 U.S. at 103, 96 S.Ct. at 2397. Second, wholly apart from the perjury issue, the conviction must be set aside if the prosecution has not volunteered evidence that is "obviously *exculpatory* [in] character." *Id.* at 107, 96 S.Ct. at 2399. (emphasis added). The testimony of Whitney and Miller would not have disclosed perjury and it was *not* exculpatory.

It is also clear that the evidence against appellant, apart from the interviews of Whitney and Miller, was so strong that the conviction must stand. Mrs. Harrison's unimpeached testimony about her husband's drug dealing activities for two years prior to arrest, the box of marijuana in the basement, the paraphernalia found next to the box, and the ledger sheet setting out cash input from the marijuana sales (see discussion *infra*) all prove beyond a reasonable doubt that appellant was properly convicted of possession of marijuana with intent to distribute. Consequently, the prosecution had no duty to inform counsel of interviews that did not in any way undercut the compelling evidence against appellant in this case.

Appellant's contentions that the government was obligated to disclose the negative character of the interviews are thus completely without merit.

### E. The Secret Service Interviews

■ Appellant's contention that the Secret Service interviews with Mrs. Harrison and Detective Penberg that allegedly disclosed discrepancies in Mrs. Harrison's testimony constitutes "new evidence" that mandates a new trial is similarly unfounded. This Court said in *Thompson v. United States,* 188 F.2d 652, 653 (D.C.Cir.1951), "[t]o obtain a new trial because of newly discovered evidence, [that evidence must be] of such nature that in a new trial it would probably produce an acquittal." In the instant case, while some of the points made by Mrs. Harrison in her discussion with the Secret Service agents varied slightly from those ultimately made in her testimony (e.g., she told the agents of her husband's drug dealing activities for the *three* years preceding arrest—her testimony only referred to *two* years of such activity), none of the resulting discrepancies were of a sort that would have damaged Mrs. Harrison's credibility with the jury in any fashion whatsoever. Insofar as this is true, appellant's new evidence was definitively not "of such nature that in a trial . . . would probably produce an acquittal." Appellant's contention to the contrary must therefore also be dismissed.

### F. The Hearsay Nature of Mrs. Harrison's Interrogation

■ In asking Mrs. Harrison at trial to describe her phone conversations with Detective Penberg, the prosecution framed a number of the questions in a manner that was likely to induce hearsay answers. Appellant argues from this that all of Mrs. Harrison's testimony on those conversations should have been inadmissible. We disagree.

While it is true that some of the questions of the prosecution could have been better framed, most of the responses given were not in the form of improper hearsay, viz., they were first hand accounts of non-hearsay evidence about what appellant had said or done with respect to marijuana distribution. These answers did *not* refer to her statements to Detective Penberg. Thus, they were clearly not hearsay.

To the extent that the trial court *did* admit a few responses phrased in a hearsay format, we find such responses to have been harmless. Such responses would unquestionably have been admissible if elicited in a straightforward format calling for anything Mrs. Harrison had seen appellant do with

respect to marijuana in the six months before his arrest. We thus see no error of substance. This contention by appellant is accordingly dismissed.

G. The Ledger Sheet

 Appellant objects to the admission of a "ledger" sheet found near the box of marijuana seized in the Harrison basement. The government contends it represents computations with respect to sales of marijuana. Appellant contends it is a tabulation of winnings in poker games in which he had been involved. However, all of the figures involve multiplication, not addition. And all of the amounts that are multiplied fit into the range of $320–380, which is most significant in view of the testimony that the undercover value of the packages of marijuana in question in this community at the time in question ranged from $300 to $400. Thus, the figures on the "ledger" deny to any person who was raised around the mining camps of Colorado, or who is otherwise familiar with poker, that they reflect poker winnings. Also some of the multipliers on the "ledger" indicate a larger number of participants in the alleged poker games than could possibly play the game even on a show-down basis. According to Hoyle,[2] "as many as fifteen" is the highest number of players that may play the game. Yet the "ledger," if Harrison is to be believed, reflects two games with 20 players and one game with 16 players. In two out of three games appellant would have us believe that 36 players *each* uniformly lost $350 and in the other game 20 players *each* uniformly lost $320. Such coincidence defies the conclusion that the ledger sheet represented "poker" winnings; but supports the conclusion that the range of the amounts represents the going prices for packages of marijuana. The same range of "prices," as testified to by the police expert, was also involved in the other computations which represented "multiplication" by lesser numbers of "players (?)."[3] Appellant's

"explanation (?)" also does not explain *dividing* 350 into 2,000.00. Appellant's "poker" claim is thus wholly unconvincing. It is inconceivable that every person playing poker *uniformly* lost amounts within this limited range.

Close inspection of the ledger thus points inexorably to the conclusion that the figures recorded therein do *not* represent poker earnings, and the jury would be justified in concluding that the figures represented the recording of marijuana sales. As noted by Detective Penberg, an acknowledged narcotics expert, the going price of marijuana in the months preceding appellant's arrest was $300–$400. All figures on the ledger, being within this "going price," could *thus* have represented sums procured through marijuana distribution. That would be a reasonable conclusion the jury could reach and the relevance and weight of the testimony was within its exclusive province.[4] Such evidence further strengthens the conclusion that appellant was properly convicted of possession of marijuana with intent to distribute.

## CONCLUSION

As we find no merit in any of appellant's arguments, we affirm the holding of the District Court.

*Judgment accordingly.*

---

**2.** T. Ainslie, Ainslie's Complete Hoyle, p. 234 (1975).

**3.** 3, 5, 5, 6, 6, 6, 7, 7, 9.

**4.** A mere glance at the so-called "ledger sheet," with its numerous scrawly computations all within the $300–$400 range and all over the sheet, would convince any juror, in view of the testimony in this case, that the defendant's claim that the exhibit represented "winnings and losings from poker" was frivolous.