UNITED STATES of America,
Plaintiff-Appellee,

v.

Michael O'CONNOR,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Mario Leon ESPINOSA–VELEZ,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Luis Eduardo CASTANEDA,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Jose Libardo CASTANO–MEDINA,
Defendant-Appellant.

Nos. 82–1566, 82–1573 to 82–1575.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 12, 1983.

Decided July 12, 1984.

Negatu Molla, Asst. U.S. Atty., Tucson, Ariz., for plaintiff-appellee.

Fredric F. Kay, Asst. Federal Public Defender, Alfred S. Donau III, Tucson, Ariz., for defendants-appellants.

Before HUG and CANBY, Circuit Judges and BURNS,* District Judge.

CANBY, Circuit Judge:

Michael O'Connor, Mario Espinosa, Eduardo Castaneda, and Jose Castano appeal from judgments entered upon jury verdicts convicting them of possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and of conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. § 846. They principally argue (1) that the undercover activities directed against them by the government constitute outrageous government conduct, (2) that the government introduced insufficient evidence to support a finding of possession under 21 U.S.C. § 841(a)(1), and (3) that the trial court committed several important evidentiary errors. We find no grounds for reversal and accordingly affirm all of the convictions.

---

* The Honorable James M. Burns, United States District Judge for the District of Oregon, sitting by designation.

## I. Outrageous Governmental Conduct

### A. Background

In 1980, in Panama, defendant Mario Espinosa, a citizen of Colombia, introduced Sonia Atala, a citizen of Bolivia, to Octavio Mejia, a citizen of Colombia. Subsequently, Atala, Mejia, and defendant Eduardo Castaneda, another citizen of Colombia, met in Colombia, where Mejia gave Atala jewels worth approximately $600,000. Mejia instructed Atala to trade the jewels in Bolivia for cocaine. The contemplated transaction aborted in late 1980 when Atala's Bolivian supplier kept the jewels without providing cocaine in return. Because Espinosa had introduced Atala to him, Mejia held Espinosa responsible for the loss he suffered.

Espinosa sent Atala a telegram in November 1981 which requested that Atala telephone him immediately. Atala had in the meantime become an informant for the Drug Enforcement Agency (DEA) and was residing in the United States. With DEA agents present, Atala called Espinosa as requested. Thereafter, in January and February 1982, Atala had a series of phone conversations with Espinosa and defendant Castaneda, whom Espinosa suggested she call. In each phone conversation, the defendants requested that Atala repay her "debt" to Mejia and expressed an interest in meeting with her to discuss repayment.

At some point during the January and February series of phone calls, DEA agents decided to use Atala's debt to Mejia as a basis for an undercover "sting." The DEA plan was that Atala would lure Espinosa, Castaneda, and Mejia to Tucson, where Atala now resided, with a promise of repaying her debt in cocaine. Then the DEA agents would arrest the defendants as they took possession of the government's cocaine.

DEA's plan proceeded as scheduled, although ultimately Mejia was never lured to Tucson. Atala offered to repay her debt with cocaine. Negotiations settled the value of Atala's debt at $1,200,000, which, the parties agreed, would be repaid with 30 kilograms of cocaine. Espinosa and Castaneda came to Tucson to accept the cocaine. They brought with them as assistants defendants O'Connor and Castano. DEA agents videotaped the delivery and then arrested all four defendants.[1]

### B. Due Process Analysis

The Supreme Court has indicated that there may be situations "in which the conduct of law enforcement officials is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–1643, 36 L.Ed.2d 366 (1973); *accord Hampton v. United States*, 425 U.S. 484, 492–93, 96 S.Ct. 1646, 1651–1652, 48 L.Ed.2d 113 (1976) (Powell, J. concurring). We have stated that prosecution is barred " 'when the government's conduct is so grossly shocking and so outrageous as to violate the universal sense of justice.' " *United States v. Ramirez*, 710 F.2d 535, 539 (9th Cir.1983) (quoting *United States v. Ryan*, 548 F.2d 782, 789 (9th Cir.1976), *cert. denied*, 430 U.S. 965, 97 S.Ct. 1644, 52 L.Ed.2d 356 (1977)). The defendants argue that the government violated due process when its agents offered Espinosa and Castaneda cocaine in exchange for settlement of Atala's debt.

We need not rule on the due process implications of government overtures to persons the government has no reason to target, for that is not our case. Here the DEA agents knew that they were offering cocaine in payment of a debt that originally had called for payment in cocaine. They were offering it to the same principals.

---

**1.** We regard the central outrageous governmental conduct issue to be whether DEA's initial offer of cocaine to Espinosa and Castaneda violated due process. The defendants also object to various of the undercover tactics used by DEA after DEA made its initial offer. We have reviewed those undercover techniques and perceive nothing improper or out of the ordinary in them. Therefore, we exclude the details of those tactics from our account of the facts and from our due process analysis.

The transaction originally planned had been a large one, for $600,000 worth of cocaine. The DEA had nothing to do with its inception. It is true that the original transaction was to have been completed in Colombia and Bolivia, and that the actions of the DEA agents caused the aborted transaction to be completed within the United States. But the nature of the original transaction and the manner of its going awry do not suggest innocent behavior, nor is there any doubt that the defendants knew that their ultimate receipt of the cocaine in the United States was unlawful. This is not a situation where "government agents engineer and direct the criminal enterprise from start to finish." *United States v. Ramirez*, 710 F.2d 535, 539 (9th Cir.1983). The capacity of these defendants to engage in cocaine transactions did not depend wholly on the assistance of the government. *See United States v. Lomas*, 706 F.2d 886, 891 (9th Cir.1983). Under these circumstances,[2] we simply cannot conclude that the action of the DEA agents in offering cocaine to defendants Espinosa and Castaneda was " 'so grossly shocking and so outrageous as to violate the universal sense of justice.' " *United States v. Ramirez*, 710 F.2d at 539 (quoting *United States v. Ryan*, 548 F.2d at 789.)

Since we have concluded that there was no outrageous government conduct toward defendants Espinosa and Castaneda, it follows even more clearly that there was none toward defendants O'Connor and Castano, who came along to Tucson to assist in the receipt of the cocaine. At the time of the government's first contact with O'Connor and Castano, there was every reason to believe that those defendants were engaged at least in a conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. § 846. It was therefore not improper for the DEA agents to deliver cocaine to them.

## II. Possession

The defendants contend that there existed insufficient evidence to support a finding of possession under 21 U.S.C. § 841(a)(1). The defendants argue that no rational trier of fact could have found possession because the extent of the government surveillance during the delivery of the cocaine prevented the defendants from exercising dominion and control over the narcotic.

■ Putting the surveillance issue to one side, there can be no doubt that a rational jury could have found possession. The delivery of the cocaine took about two hours because Espinosa and Castaneda insisted that O'Connor and Castano evaluate the purity of each of the thirty one-kilo bags of cocaine. During that period, Espinosa and Castaneda controlled what tests were performed on the cocaine. Later, they supervised the secreting of the cocaine in their vehicle. Therefore, a rational jury could have found that, because Espinosa and Castaneda exercised " 'dominion and control ... so as to give power of disposal of the drug,' " they had constructive possession of the cocaine. *United States v. Batimana*, 623 F.2d 1366, 1369 (9th Cir.1980) (quoting *Arellanes v. United States*, 302 F.2d 603, 606 (9th Cir.), *cert. denied*, 371 U.S. 930, 83 S.Ct. 294, 9 L.Ed.2d 238 (1962)), *cert. denied*, 449 U.S. 1038, 101 S.Ct. 617, 66 L.Ed.2d 500 (1980). O'Connor and Castano performed the tests on the cocaine and consequently handled the cocaine extensively during the two-hour delivery. That exercise of control suffices to support a finding of actual possession. *See United States v. Vomero*, 567 F.2d 1315, 1316 (5th Cir.1978) (the mere weighing of cocaine is sufficient to support a finding of actual possession). Moreover, because the district court gave an aiding and abetting instruction, both O'Conner and Castano could have been found to have possessed

---

**2.** The government introduced extensive materials in camera so that the district court could determine whether the government fulfilled its obligations under the Jencks Act, 18 U.S.C.

§ 3500, and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We have not taken those materials into account in evaluating the government's conduct.

the cocaine as aiders and abetters. *See* 18 U.S.C. § 2.

■ We agree with the defendants that there was extensive government surveillance during the cocaine delivery and that there was scant, if any, chance that the government-supplied cocaine would find its way into distribution. We disagree, however, that this fact should have any relevance to the possession issue. Congress enacted 21 U.S.C. § 841(a)(1) to reduce the distribution of narcotics in the United States. The defendants' narrow interpretation of "possession" conflicts with the congressional purpose because it would erect an impediment to the government's conduct of undercover operations. Therefore, we conclude, as have other circuits, *see United States v. Jones,* 676 F.2d 327, 332 (8th Cir.), *cert. denied,* 459 U.S. 832, 103 S.Ct. 71, 74 L.Ed.2d 71 (1982); *United States v. Martorano,* 709 F.2d 863, 870–71 (3d Cir.1983), that the presence or absence of surveillance does not bear on the question of possession.[3]

Because we reject the defendants' surveillance argument, we conclude that there existed sufficient evidence to support the finding of possession.

### III. Evidentiary Issues

#### A. Evidence of the Aborted Colombian Deal

At various points in the trial, the government introduced evidence about the aborted Colombian narcotics transaction that occurred in 1980. The defendants object to the introduction of that evidence under Fed.R.Evid. 404(b) because they claim it was evidence of prior bad acts introduced to show the defendants acted in conformity therewith. They also object to the introduction of the evidence about the aborted Colombian drug deal on the grounds that it

was unduly prejudicial and so should have been excluded under Fed.R.Evid. 403.

■ Admitting evidence about the aborted Colombian transaction did not violate Rule 404(b). If the government were not permitted to introduce the evidence about Atala's debt to the conspirators, the government's undercover operation would have seemed an incredible exercise in which the government was giving away over a million dollars worth of cocaine to the defendants for nothing in return. Evidence of the Colombian deal was necessary background. As such, it was properly admitted under Rule 404(b). *See Carter v. United States,* 549 F.2d 77, 78 (8th Cir. 1977); McCormick, *Evidence* 448 (2d Ed. 1972).

Nor does Rule 403 provide a basis for reversal. Rulings of the trial court under Rule 403 are subject to an abuse of discretion review by this court. *United States v. Bradshaw,* 690 F.2d 704, 708 (9th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 3543, 77 L.Ed.2d 1392 (1983). Given the importance of the Colombian transaction as background, we cannot say that the district court abused its discretion under Rule 403.

#### B. Coconspirators' Statements

The defendants object to the admission of a number of their out-of-court declarations. None of the trial judge's rulings constitutes reversible error.

■ First, the defendants object to the introduction of transcripts of the conversations which Atala had with Espinosa and Castaneda during November 1981 and January and February 1982.[4] The defendants claim that the transcripts were improperly admitted under Fed.R.Evid. 801(d)(2)(E), the coconspirator exception to the hearsay rule, and that the introduction of the transcripts violated the doctrine of *Bruton v.*

---

**3.** The defendants based much of their possession argument on language from the concurring opinion in *United States v. Batimana,* 623 F.2d 1366, 1371 (9th Cir.1980) (Fletcher, J., concurring), which indicated that possession cannot be found in a "transaction ... tightly controlled by the police." *Id.* The position of the concurrence in *Batimana* was not adopted by the majority in that case. We decline to apply it to the facts of this case.

**4.** DEA agents had taped and transcribed the conversations.

*United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

The defendants' Rule 801(d)(2)(E) objection is groundless. The district court did not admit any of the transcripts under Rule 801(d)(2)(E), but rather admitted them pursuant to Rule 801(d)(2)(A), the party admission exception to the hearsay rule. Consistently with admission under 801(d)(2)(A), the district court limited the use of each transcript to the defendant involved. The defendants' *Bruton* objection is equally groundless. In none of the conversations did either Espinosa or Castaneda mention cocaine or raise the idea that Atala should repay her debt with cocaine. Therefore, the conversation lacked the "powerfully incriminating" or "devastating" impact required for a *Bruton* violation. *See Bruton,* 391 U.S. at 135–36, 88 S.Ct. at 1627–1628.

The defendants next object to the introduction of a set of statements made by Castaneda during the negotiations concerning the size of Atala's debt and the terms of the cocaine transaction. Specifically, the defendants object to Castaneda's statement that he and Espinosa were "partners with Mejia in this particular transaction," to his statements about the amounts of money and jewels which had been given to Atala, and to his statement that he had sold 1600 kilos of cocaine in Miami over the last year. The defendants claim that, because none of the statements furthered the conspiracy, the statements were improperly admitted under Rule 801(d)(2)(E). They also claim that admission of the statements violated their rights under the confrontation clause.

■ Admission of Castaneda's first statement did not violate Rule 801(d)(2)(E). The statement that Espinosa and Castaneda were Mejia's partners furthered the conspiracy because it assured the DEA agents and Atala that Espinosa and Castaneda had authority to resolve Atala's debt. Nor did admission violate the confrontation clause. " '[C]onfrontation clause analysis should

proceed case-by-case under a two-track approach that tests the necessity and reliability of the contested testimony,' " *United States v. Layton,* 720 F.2d 548, 561 (9th Cir.1983) (quoting *United States v. Perez,* 658 F.2d 654, 660 (9th Cir.1981)); *accord Ohio v. Roberts,* 448 U.S. 56, 65–66, 100 S.Ct. 2531, 2538–2539, 65 L.Ed.2d 597 (1980). Use of Castaneda's first statement was necessary because Castaneda's status as a codefendant made him unavailable to the prosecution. *United States v. Arbelaez,* 719 F.2d 1453, 1460 (9th Cir.1983). The statement met the indicia of reliability set forth in *Dutton v. Evans,* 400 U.S. 74, 88–89, 91 S.Ct. 210, 219–220, 27 L.Ed.2d 213 (1970): the statement was not an assertion of past fact; Castaneda had personal knowledge of Espinosa and Mejia and did not rely upon recollection of past circumstances; and the statement was against Castaneda's penal interests.

■ Admission of Castaneda's statement about the money and jewels given to Atala did not violate 801(d)(2)(E) because the statements furthered the conspiracy by enlarging the size of the debt which Atala had to repay. It is a much closer question whether admission of the statements violated the confrontation clause. The statements may have lacked sufficient trustworthiness to satisfy the requirements of the confrontation clause because Castaneda was recounting past facts about which he lacked personal knowledge and because he had an incentive to exaggerate.[5] Nevertheless, we do not regard the error, if any, as significant. Castaneda's statements about the size of Atala's debt implicated neither himself nor the other defendants in the charged conspiracy. In light of the other evidence of guilt, including videotapes of the cocaine delivery, the error, if any, was harmless beyond a reasonable doubt.

■ Castaneda's declaration that he had sold 1600 kilos of cocaine over the last

---

**5.** The statements could properly have been admitted if the trial court had limited their use to showing that negotiations occurred. Because

no limiting instruction was given, however, the jury was free to use the statements to prove the matters asserted.

year in Miami probably should not have been admitted under 801(d)(2)(E). When it is read in context, the declaration appears to have been made to induce Atala and the DEA agent negotiating with her to have future dealings with Castaneda after completion of the charged conspiracy, not to induce Atala and the agent to participate in the charged conspiracy. Such declarations do not further the conspiracy. *United States v. Foster*, 711 F.2d 871, 880 (9th Cir.1983); *United States v. Fielding*, 645 F.2d 719, 727 (9th Cir.1981). Nevertheless, admission of the declaration under 801(d)(2)(E) was harmless beyond a reasonable doubt.[6] Castaneda's statement did not mention or implicate anyone but himself. Castaneda himself cannot complain about the use of the statement because it could have been introduced against him as a party admission. Fed.R.Evid. 801(d)(2)(A).[7]

The defendants finally object to the introduction of two statements that were made during the delivery and testing of the cocaine. First, they object to the introduction of Castaneda's statement that he had known O'Connor for eight years. Second, they object to the introduction of Castaneda's and Espinosa's declarations that they would lend Atala and a DEA agent a chemist if they did future business in South America. The defendants claim that, because the statements did not further the conspiracy, they do not qualify for admission under Rule 801(d)(2)(E). They also assert that admission of the statements violated the confrontation clause.

 We agree that neither statement should have been admitted under 801(d)(2)(E). Castaneda's statement that he had known O'Connor for eight years was made in response to a comment that O'Connor looked like a cop. Therefore, the statement was mere "idle chatter" inadmis-

sible under Fed.R.Evid. 810(d)(2)(E). *United States v. Layton*, 720 F.2d 548, 556 (9th Cir.1893) (quoting *United States v. Kendall*, 665 F.2d 126, 133 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982)). The offer of a chemist concerned future transactions. Therefore, it did not further the charged conspiracy. *United States v. Foster*, 711 F.2d 871, 880 (9th Cir.1983); *United States v. Fielding*, 645 F.2d 719, 727 (9th Cir.1981).

 Although admission of the statements was error, neither constitutes reversible error. The statement concerning O'Connor adversely affected only O'Connor. As to him, it could have been admitted as an "adoptive admission." Fed.R. Evid. 801(d)(2)(B). It was made in his presence and hearing; he was capable of understanding the statement; and he could have denied it. *See United States v. Sears*, 663 F.2d 896, 904 (9th Cir.1981), *cert. denied*, 455 U.S. 1027, 102 S.Ct. 1731, 72 L.Ed.2d 148 (1982); *United States v. Moore*, 522 F.2d 1068, 1075 (9th Cir.1975), *cert. denied*, 423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637 (1976). The statements about the chemist were equally harmless. They were incidental remarks in a long trial. The other evidence introduced at the trial overwhelmed whatever incriminating aspects the statements might have had if considered in isolation.

## IV. Other Claims

### A. Amendment of the Indictment

Defendants argue that the trial violated their fifth amendment right to be tried only on a "presentment or indictment of a Grand Jury." They claim that, although the indictment charged them with a conspiracy to possess with intent to distribute

---

6. We test this and subsequent violations of 801(d)(2)(E) under the harmless error standard applicable to constitutional errors, *see Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1969), thus obviating the need to apply a confrontation clause analysis.

7. Although the declaration was evidence of prior bad acts, Fed.R.Evid. 404(b) would not have

barred its use against Castaneda because in a narcotics trial evidence of prior narcotics transactions is admissible to show "intent, knowledge, and scheme or plan." *United States v. Valencia*, 492 F.2d 1071, 1074 (9th Cir.1974); *accord United States v. Harrison*, 679 F.2d 942, 948 (D.C.Cir.1982).

the government-supplied cocaine, they were in fact tried both for that conspiracy and for the aborted Colombian jewels-for-cocaine transaction.

■■■ The defendants' argument has no basis in fact. The instructions to the jury limited the charge to the conspiracy concerning the government-supplied cocaine. Therefore, there was no improper amendment of the indictment.

### B. *Kotteakos* Variance

■■■ The defendants claim that the trial violated their rights under *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), because, although they were charged with a single conspiracy, evidence of other conspiracies (namely, the aborted Colombian transaction and Castaneda's Miami dealings) was introduced at trial.

There is a critical difference between this case and *Kotteakos*. In *Kotteakos*, there existed insufficient evidence to convict the defendants of the charged conspiracy. Here there was ample evidence to convict the defendants of the charged conspiracy. Under our precedent, *Kotteakos* is inapplicable if, as is the case here, the evidence supports a finding that the charged conspiracy exists. *United States v. Kenny*, 645 F.2d 1323, 1335 (9th Cir.1981), *cert. denied*, 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981); *United States v. Lutz*, 621 F.2d 940, 943 (9th Cir.1980), *cert. denied*, 449 U.S. 859, 101 S.Ct. 160, 66 L.Ed.2d 75 (1980).

### C. Severance

■■■ Finally, the defendants argue that the district court's failure to sever their trial into separate trials for each defendant was reversible error. We need not reach the merits of the defendants' argument. "It is a general rule that to preserve the point, the motion to sever must be renewed at the close of the evidence." *United States v. Long*, 706 F.2d 1044, 1053 (9th Cir.1983); *United States v. Gaines*, 563 F.2d 1352, 1356 (9th Cir.1977). The defendants did not move to sever at the close of the evidence.[8]

### V. Conclusion

Finding no ground for reversal in any of the contentions raised by defendants, we affirm all the convictions.

AFFIRMED.

---

8. *United States v. Kaplan*, 554 F.2d 958 (9th Cir.), *cert. denied*, 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977), held that "when the motion accompanies the introduction of evidence deemed prejudicial and a renewal at the close of all evidence would constitute an unnecessary formality," then a failure to request severance at the end of the trial may be excused. *Id.* at 965. The defendants, however, do not fall within the *Kaplan* exception. They requested severance only once during the proceedings below. That request was a pre-trial motion based on their fear that the government would introduce evidence that defendant Castano had been convicted of an earlier narcotics offense. As it turned out at trial, the government never introduced Castano's conviction. At no point did the defendants even ask for severance because of the evidence which was actually introduced at trial. Such a motion at the close of evidence would therefore clearly not have been an unnecessary formality.