*558 KAREN LeCRAFT HENDERSON, Circuit Judge,
dissenting:
I disagree with the majority’s conclusion that Davon Peyton’s great-grandmother Martha Mae Hicks lacked authority to consent to the July 14, 2009 search of the shoebox found lying on the living room floor of the apartment she and Peyton shared.[1] Hicks plainly had not only apparent but actual authority to consent to a search of the common living room and its contents, including the shoebox. Accordingly, I dissent from the majority’s decision and would affirm the district court’s judgment.[2]
I believe the district court correctly concluded that Hicks’s consent to search the apartment, including the living room, was valid because “she possessed common authority over the entire apartment.” Transcript of Motions Hearing 100, United States v. Peyton, Crim. No. 10-15 (D.D.C. July 22, 2010) (7/22/2010 Hr’g Tr.) (citing United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974)); see Georgia v. Randolph, 547 U.S. 103, 106, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006) (“The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained.” (citing Illinois v. Rodriguez, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); United States v. Matlock, supra)). Regarding the living room in particular, the court found that “[t]he fact that it could be said that [Peyton] used the living room as a bedroom doesn’t detract from the fact that it was also the living room in the apartment and that they shared common authority over both the living room and the kitchen and the single bathroom.” 7/22/2010 Hr’g Tr. 100. This finding — which the majority does not gainsay — is not clearly erroneous. See United States v. Wilson, 605 F.3d 985, 1027 (D.C.Cir.2010). The living room was to all appearances a common area (as a “living room” by customary usage generally is) notwithstanding Peyton used it “as a place for sleeping, at least on occasion,” 7/22/2010 Hr’g Tr. 43 (stipulation by parties); it offered the only access to the kitchen and Peyton’s purported personal living area within the living room was not specifically demarcated. The particular “circumstances” the government cited to support the room’s common nature (as the majority recites them) — that the living room “remained a common area, with a diminished expectation of privacy for things left there” and that Peyton “took no special steps to hide or protect the shoebox[, which] is not ‘the type of container that has historically been accorded the highest privacy expectations’ ” — do indeed “suggest that the shoebox was not a private space and that it was reasonable for the police to believe that Hicks’s authority over the living room also encompassed the *559 shoebox.” Majority Opinion (Maj. Op.) at 553 (quoting Br. for Appellee at 34).
As the majority correctly recites, the officers searching the apartment “knew that Hicks and Peyton both lived in the small apartment” — this is precisely the circumstance that gave each of them shared authority over the common areas — and, in light of Peyton’s age and relationship to Hicks, that the police “were thus on notice that some spaces in the apartment might be used exclusively by Peyton.” Id. at 553 (emphases added); cf. United States v. Whitfield, 939 F.2d 1071, 1075 (D.C.Cir.1991) (noting parents may (or may not) “permit their adult sons and daughters to have exclusive use of the rooms they occupy”).
Where the majority strays, however, is in its assertion that Hicks made a “clear statement that there was an area of the [living] room that was not hers.” Maj. Op. at 554. The sole evidence the majority offers of the “clear statement” that Hicks had ceded authority over some amorphous “area of the room” is the recital in a later search warrant affidavit signed by one of the searching officers that the officer “went to a bed in the apartment’s living room”[3] and “Hicks identified this as the area where Mr. Peyton keeps his personal property.” Def.’s Ex. 6, Aff. ¶7, United States v. Peyton, Crim. No. 10-15 (D.D.C. July 22, 2009) (JA 60). To derive from this simple (yet vague) account of Hicks’s words that there was some “portion of the living room that Peyton claimed and Hicks acknowledged was uniquely his,” Maj. Op. at 551 (emphasis added) — and from which Hicks herself was therefore excluded (or at least deprived of authority thereover)— is a stretch too far. Moreover, Hicks herself asserted authority over the entire apartment. The consent form she signed authorized the officers “to conduct a complete search of [her] premises” and, after signing the form, Hicks instructed the officers: “This is my house and if Davon has anything illegal in here I want you to take it.” Gov’t Ex. 6 (signed consent form); Def.’s Ex. 6 ¶ 6 (search warrant affidavit) (emphasis added), United States v. Peyton, Crim. No. 10-15 (D.D.C. July 22, 2009) (JA 55, 60). None of these circumstances makes it even “arguably ... ‘obvious’ that the closed shoebox belonged specifically to Peyton.” Maj. Op. at 555 (emphasis added).
Nor is the precedent the majority cites convincing. In United States v. Whitfield, 939 F.2d 1071 (D.C.Cir.1991), the majority’s principal authority, the court faced a far different factual situation. There, government agents had seized evidence (stolen cash) from the pockets of four coats hanging in the clothes closet opening off the defendant’s second floor bedroom in his mother’s house, after they obtained the mother’s consent to search the bedroom. The court concluded that “[a]s a factual matter, the agents could not reasonably have believed Mrs. Whitfield had authority to consent to th[e] search” because they “simply did not have enough information to make that judgment.” 939 F.2d at 1074. The court explained that, assuming the agents had reason to believe the mother, as a resident of the house, “ ‘generally’ had ‘joint access’” to her son’s unlocked bedroom, her “ability, or even legal right, *560 to enter simply qualified her as a person who ... could give consent to a search of property subject to her ‘mutual use,’ ”— “whether she had ‘mutual use’ of the room or the closet containing the defendant’s clothing could not be determined” given “[t]he bedroom itself was not a ‘common area’ and the agents had no grounds for believing otherwise.” Id. (quoting Matlock, 415 U.S. at 171 n. 7, 94 S.Ct. 988, q.v. (“The authority which justifies the third-party consent ... rests ... on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.”)). The “ambiguous situation” in Whitfield was whether the adult son’s separate bedroom, which was plainly “not a ‘common area,’ ” and the adjoining closet — accessible only through the bedroom and containing the son’s clothing in which the contraband was found — constituted “his private enclave.” Id. at 1075. There was no such ambiguity regarding the common living room here; the disputed area was indeed indistinguishable from the rest of the open living room space which was “common” not only because it was the “living room” but also because it constituted the sole pathway to the kitchen. That Peyton slept in the room “on occasion” and “ke[pt] his personal property” there did not transform the room — or some unmarked and undefined area within it — into his personal preserve to the exclusion of Hicks and her belongings. Without some indication from Hicks that the shoebox was off-limits to her, the officers were not “faced with an ambigu[ity]” different from that attaching to any property in any common area shared by more than one resident.[4]
The situation here more closely resembles United States v. Harrison, 679 F.2d 942 (D.C.Cir.1982). In Harrison, the defendant’s wife (Mrs. Harrison) had invited police officers to the house she shared with the defendant and asked them to remove “two large unsealed boxes containing seventeen packages of marijuana” she had found “in a storage area used by both her and [the defendant] under the basement stairwell.” Id. at 945. We affirmed the district court’s denial of the defendant’s motion to suppress the marijuana because Mrs. Harrison “had full authority to release the boxes of marijuana into police custody, viz., she fit[] fully within the ‘common authority’ criteria enunciated in Matlock. ” Id. at 947. The court explained:
Mrs. Harrison had full “common authority” to the storage area in the basement. That area was unlocked and open, and contained personal items that belonged to both appellant and his wife. The boxes were not sealed or taped and were closed only by “criss-crossed” flaps. Moreover, the record provides no indication that the boxes were marked in any way indicating appellant’s ownership. Nor is there anything in the record to indicate that appellant ever asserted that the boxes were exclusively in his control or even that they were his personal effects.
Id. Like the boxes in Harrison, the shoebox here was found in plain sight, unsealed and unmarked, within a shared common area. Nothing about the box itself suggested it was private, much less exclusive to Peyton. Nor does the record indicate that Hicks’s “common authority” over the *561 living room had been partitioned to exclude the box or the area of the floor where it was found. Armed with the consent of coresident Hicks to search the entire living room — without any express reservation — the searching officers could reasonably believe, at a minimum, that her authority to consent reached the shoebox lying in plain view on the living room floor. See Illinois v. Rodriguez, 497 U.S. 177, 186, 110 S.Ct. 2798, 111 L.Ed.2d 148 (1990) (“Whether the basis for [the authority to consent to a search] exists is the sort of recurring factual question to which law enforcement officials must be expected to apply their judgment; and all the Fourth Amendment requires is that they answer it reasonably”). They were entitled to “proceed on the basis of the ‘factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.’ ” Whitfield, 939 F.2d at 1074 (quoting Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)). Thus, they could “assume” that co-residents great-grandmother and great-grandson, like husband and wife in Harrison, “mutually use the living areas in their residence and have joint access to them so that either may consent to a search.” Whitfield, 939 F.2d at 1074-75 (citing Harrison, 679 F.2d at 946-47). The officers were not required to engage in “metaphysical subtleties” to carve out a separate but undefined room-within-a-room that was reserved to Peyton’s exclusive use and dominion. See Frazier v. Cupp, 394 U.S. 731, 740, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (declining to “engage in such metaphysical subtleties in judging the efficacy of [defendant’s cousin’s] consent” to search duffel bag as would be required under defendant’s theory that cousin “only had actual permission to use one compartment of the bag and that he had no authority to consent to a search of the other compartments”).[5]
One fact the majority completely ignores is to me critical to a common sense review of the challenged search. According to the record, the 85-year-old Hicks, shaking her head, told the officers: “This is my house and if Davon has anything illegal in here I want you to take it.” Def.’s Ex. 6 ¶ 6, supra, p. 4. When a law abiding citizen, especially an elderly one, asks the police to remove contraband from her home, what would my colleagues have the police do? Wait until the undesirables who inevitably show up where drugs are kept do her some harm? Or until Peyton himself, high on cocaine, sets fire to the apartment? The notion that a citizen cannot rid her home of contraband by asking the police to do so and, in aid thereof, helping the officers in their search by indicating a likely location — but instead must be told: “Sorry, Ma’am, we can’t do that without your establishing that you have use and control of every inch of the living room.” — is on its face senseless. It also flies in the face of Fourth Amendment jurisprudence as most *562 recently expounded by the United States Supreme Court in Fernandez v. California, — U.S. -, 134 S.Ct. 1126, 188 L.Ed.2d 25 (2014).
In Fernandez, the Supreme Court affirmed the rule that “consent by one resident of jointly occupied premises is generally sufficient to justify a warrantless search.” Id. at 1183. Following this rule, the Court upheld the search of an apartment to which resident Roxanne Rojas consented approximately one hour after co-resident Walter Fernandez expressly refused the police entry to search, whereupon he was arrested on suspicion of domestic assault and taken to the police station for booking. The Court narrowly construed the exception to the co-resident consent rule carved out in Georgia v. Randolph, which prohibits a search if a second coresident objects thereto — “accepting] Randolph on its own terms” to “unequivocally require! ] the presence of the objecting occupant.” Id. at 1134-35. “Putting the exception the Court adopted in Randolph to one side,” the Court instructed, “the lawful occupant of a house or apartment should have the right to invite the police to enter the dwelling and conduct a search.” Id. at 1137. “Any other rule would trample on the rights of the occupant.” Id. In particular, the Court advised, “an occupant may want the police to conduct a thorough search so that any dangerous contraband can be found and removed,” noting that in Fernandez “the search resulted in the discovery and removal of a sawed-off shotgun to which Rojas’ 4-year-old son had access.” Id. at 1137. In this case, Hicks consented to the police search of the living room for the express purpose of removing contraband from her apartment — a reasonable request the majority would have the police — and this court — ignore. Her guidance to the police, as I note below, did not affect the scope of her authority to consent to the search.
It is true, as the Majority observes, that the mere “desire” to remove contraband “cannot ... create! ] ... common authority that does not otherwise exist.” Maj. Op. at 555-56. The majority does not dispute, however, that Hicks had authority, as the district court found, to consent to a search of the common living room, see supra p. 552, which authority “extends to most objects in plain view” — including the seized shoebox. Donovan v. A.A. Beiro Constr. Co., 746 F.2d 894, 901-02 (D.C.Cir.1984). “The touchstone of Matlock’s third party consent analysis is that any reasonable expectation of privacy in common areas is lost once joint occupants assume the risk that a co-occupant will allow access to the common areas.” Id. at 899. Peyton assumed just such a risk and, accordingly, had no reasonable expectation of privacy in the shoebox that he left lying unmarked and unsecured on the floor, visible and accessible to Hicks and to anyone Hicks might invite into their shared living room — including the police. See id. at 902 (To determine whether a reasonable expectation of privacy exists, we apply a “rule ... of reason that assesses the critical circumstances indicating the presence or absence of a discrete expectation of privacy with respect to the particular object: whether it is secured, whether it is commonly used for preserving privacy, etc.” (quoting United States v. Block, 590 F.2d 535, 541 n. 8 (4th Cir.1978) (noting: “Obviously not every ‘enclosed space’ within a room or other area — e.g. pockets in clothes, unsecured shoeboxes, and the like — can claim independent status as objects capable of search not within reach of the authorized area search.”))). I do not see how Peyton’s privacy expectation could possibly be revived by anything that Hicks said to the officers. The Supreme Court’s concern expressed in Fernandez only high *563 lights Hicks’s right, as a lawful occupant of the apartment, to enlist police assistance to remove illegal drugs from the living room she and Peyton shared. She should not, as the majority suggests, be reduced to self-help to evict from her home the drug trafficking culture Peyton has invited in. Such a rule would “trample on [her] rights.” Fernandez, 134 S.Ct. at 1137.[6]
The majority and I have together written almost 30 pages — not only to decide this case but also to guide a constituency made up in large part of police officers, trial judges and the bar. My colleagues rely on the common sense language of Whitfield that an officer “faced with an ambiguous situation ” must make further inquiry before concluding that “the property about to be searched is subject to ‘mutual use’ by the person giving consent.” Maj. Op. at 554 (quoting 939 F.2d at 1075 (quoting Rodriguez, 497 U.S. at 188-89, 110 S.Ct. 2793)).[7] At the same time, they appear to recognize that “this limitation on the scope of common authority might seem to put the police in a bind.” Id. at 553. But then, distinguishing between the shoebox and “say, the drawers of the television stand,” id., both of which are located in a mutual use living room, they conclude that the officers’ search of the drawers would be reasonable but that the shoebox is verboten. On the basis of a distance of no more than a few feet, then, they have decided whether or not property is subject to mutual use. How this measuring-stick jurisprudence is supposed to assist those who look to us for guidance wholly escapes me. Accordingly, I respectfully dissent.

. In district court, Hicks was referred to as Peyton’s "grandmother” or great-grandmother, although he now characterizes her as his great-great-grandmother. See Br. for Appellant at 4 n.2.

. I thus see no need to address Peyton’s argument that the January 2010 search was unlawful as tainted by the July 14, 2009 search. See Majority Opinion (Maj. Op.) at 556-57. I would also affirm the district court’s other holdings regarding the July 14, 2009 search because Peyton's girlfriend Tyra Harvey, as a guest, had authority to open the apartment door to the police and the district court did not clearly err in finding Hicks’s consent to the apartment search was voluntary. See 4 Wayne R. LaFave, Search and Seizure § 8.5(e) (5th ed.2012) (authority of guest to open door to police); United States v. Wilson, 605 F.3d 985, 1027 (D.C.Cir.2010) (clear error standard for voluntariness of consent).

. Although the search warrant affidavit refers to a "bed,” the officer who testified at the evidentiary hearing "d[id not] recall if there was a bed or couch” but "believe[d] there was a couch that was there.” 7/22/2010 Hr’g Tr. 42. The government referred to it below as a "daybed.” Gov’t’s Opp'n to Def.’s Mot. to Suppress Tangible Evidence 1, Transcript of Motions Hearing at 8, United States v. Peyton, Crim. No. 10-15 (D.D.C. July 27, 2010) (7/27/2010 Hr’g Tr.).

. Indeed, the majority makes Hicks’s guiding the officers to the area of the living room where Peyton slept and "kept his stuff” tantamount to a declaration that she surrendered her use thereof.

. Even were Peyton’s room-within-a-room theory persuasive, I would find it forfeited because he failed to articulate it to the district court. See United States v. Vinton, 594 F.3d 14, 24 (D.C.Cir.2010); United States v. Redman, 331 F.3d 982, 986 (D.C.Cir.2003). The argument Peyton offered below — that Hicks lacked authority to consent to the search of the living room as a whole, which is a discrete, albeit common unit of the apartment— is quite different from the more complex argument he raises now — that she lacked authority to consent to a search of some specific area within the room — where Peyton slept and kept his belongings or the contents of that area. Cf. Vinton, 594 F.3d at 24 (appellant who argued in district court that officer lacked probable cause based on facts uncovered during investigative stop waived argument on appeal challenging probable cause finding based on supporting facts having been obtained only after investigativé stop was extended beyond reasonable duration).

. In Fernandez, the Court rejected the petitioner's argument that his objection to the search should remain effective until withdrawn in part because such a rule “would create the very sort of practical complications that Randolph sought to avoid,” noting that Randolph "adopt[ed] a ‘formalisftic]’ rule, but it did so in the interests of ‘simple clarity’ and administrability.” 134 S.Ct. at 1135 (quoting Randolph, 547 U.S. at 121, 122, 126 S.Ct. 1515).

. As already noted, supra pp. 550-51, there was no ambiguity surrounding Hicks’s authority to consent.